IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Troy Ivery,<br><br>    Plaintiff,<br><br>  v.<br><br><br>CarMax, Inc., CarMax Auto Superstores, Inc., and CarMax Enterprise Services, LLC,<br><br>    Defendants. | Case No.:   3:26-cv-02723-SAL-TER<br><br>**COMPLAINT**<br>Jury Trial Requested |

## INTRODUCTION

Plaintiff Troy Ivery, by and through his undersigned counsel, brings the Causes of Action of Race Discrimination and Retaliation pursuant to 42 U.S.C. Section 1981, as amended, and Breach of Contract against Defendants CarMax, Inc., CarMax Auto Superstores, Inc., and CarMax Enterprise Services, LLC, based on the following allegations.

## JURISDICTION AND VENUE

1. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the laws of the United States, including 42 U.S.C. § 1981. This Court has supplemental jurisdiction over Plaintiff's state-law claim for Breach of Contract pursuant to 28 U.S.C. § 1367.

2. Venue is proper in the United States District Court for the District of South Carolina pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within the District of South Carolina.

3. Venue is proper in the Columbia Division pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Richland

1

County, South Carolina, which is located within the Columbia Division, and because Defendants regularly conduct business, are situated, and may be found within this Division.

## PARTIES

4. Plaintiff Troy Ivery (hereinafter, "Plaintiff") is a citizen and resident of Richland County, South Carolina. At all times relevant hereto, Plaintiff was employed by Defendants and performed work within the State of South Carolina.

5. Defendant CarMax, Inc. is a corporation organized and existing under the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia. Upon information and belief, Defendant CarMax, Inc. exercised control over the terms, conditions, policies, and practices governing Plaintiff's employment and conducted business within the State of South Carolina.

6. Defendant CarMax Auto Superstores, Inc. is a corporation organized and existing under the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia. Upon information and belief, Defendant CarMax Auto Superstores, Inc. employed Plaintiff and/or exercised control over the terms and conditions of Plaintiff's employment within the State of South Carolina.

7. Defendant CarMax Enterprise Services, LLC is a limited liability company organized and existing under the laws of Virginia, with its principal place of business in Richmond, Virginia. Upon information and belief, Defendant CarMax Enterprise Services, LLC provided human resources, payroll, employment, management, and/or administrative services related to Plaintiff's employment and conducted business within the State of South Carolina.

8. At all times relevant to this Complaint, Defendants CarMax, Inc., CarMax Auto Superstores, Inc., and CarMax Enterprise Services, LLC (hereinafter, collectively referred to as

2

"Defendants") operated as an integrated enterprise and/or joint employer with respect to Plaintiff's employment. Defendants shared common management, centralized control of labor relations, common ownership, and exercised control over the terms, conditions, and privileges of Plaintiff's employment.

9. At all times relevant hereto, Defendants acted by and through their officers, agents, servants, managers, supervisors, and employees, who were acting within the course and scope of their agency and employment. The acts and omissions alleged herein were authorized, ratified, approved, and/or committed by Defendants through their respective representatives.

### FACTS

10. Plaintiff is an African American male who began his employment with Defendants on December 28, 2020, as a Field Logistics Manager.

11. Throughout his employment, Plaintiff regularly achieved successful and exceptional performance ratings and was regarded as a high-performing manager within Defendants' Transportation Department.

12. Upon information and belief, Plaintiff was among the top-performing Field Logistics Managers within his region.

13. Defendants maintained a policy known as the "Treating Associates with Respect Policy" ("TAWR Policy"), which states, in part, that Defendants are committed to maintaining a workplace free from disrespectful conduct, discrimination, retaliation, and harassment.

14. In addition to the TAWR Policy, Defendants established criteria governing promotion and advancement within the Logistics and Transportation Department. At all times relevant hereto, Defendants represented that successful completion of the Senior Management Development Program ("SMDP") was a prerequisite for promotion to the position of Senior Logistics Manager and advancement within Defendants' Logistics leadership structure.

15. During Plaintiff's employment, Defendants applied promotional criteria inconsistently and exercised promotional discretion in a manner that favored Caucasian employees over similarly situated African American employees.

16. In April 2021, Defendants hired Rich McCart, a Caucasian male, as a Logistics Manager.

17. Less than one year later, Defendants promoted Mr. McCart to Senior Logistics Manager despite his failure to complete the SMDP, which Defendants represented was a requirement for promotion.

18. Upon information and belief, Mr. McCart did not complete the SMDP until approximately mid-2024, well after receiving the promotion.

19. Defendants also promoted multiple non-African American managers shortly after their completion of the SMDP, including Emilio Ferreiro, Kyler Vargas, and Jessy Pesantes.

20. By contrast, Plaintiff completed the SMDP, possessed substantial logistics and transportation leadership experience, and remained unpromoted.

21. Notably, Plaintiff successfully completed the SMDP on or about December 21, 2023, thereby satisfying Defendants' stated qualifications for promotion to Senior Logistics Manager.

22. Plaintiff was the only African American Logistics Manager within Defendants' South Carolina region to successfully complete the SMDP.

23. Despite satisfying Defendants' stated qualifications for advancement, Plaintiff was not promoted to Senior Logistics Manager.

24. In or about mid-2024, Defendants restructured their transportation operations and consolidated more than 230 stores into approximately sixteen divisions.

25. Defendants represented that there were insufficient SMDP-qualified managers available to fill all Senior Logistics Manager positions created by the restructuring.

26. Despite claiming a shortage of qualified candidates, Defendants selected multiple Caucasian males from outside the Logistics and Transportation Department to fill Senior Logistics Manager positions, including Tim Barnett and Bill St. Pierre.

27. Upon information and belief, these individuals lacked Plaintiff's logistics and transportation management experience and had not developed their careers within Defendants' Logistics Department.

28. At the time of these appointments, Plaintiff had completed the SMDP and possessed more than three years of direct logistics and transportation leadership experience with Defendants.

29. Nevertheless, Defendants failed and refused to promote Plaintiff while promoting similarly situated Caucasian employees to Senior Logistics Manager positions.

30. During his employment, Plaintiff also reported workplace conduct that he reasonably believed violated Defendants' policies prohibiting discrimination, harassment, and other misconduct.

31. In or about April 2024, Plaintiff raised concerns regarding an associate's workplace conduct and reported information that he reasonably believed violated Defendants' TAWR Policy. Such concerns had also been raised in April 2022 against the same employee who specifically appeared to engage in conduct which violated Defendants' policies prohibiting discrimination and harassment.

32. In making such reports, Plaintiff believed he was acting in accordance with Defendants' policies and fulfilling his responsibilities as a manager.

5

33. Moreover, during his employment, Plaintiff observed an overall lack of African American representation within upper-level transportation leadership positions.

34. In March 2024 and September 2024, Plaintiff utilized Defendants' Associate Voice Survey process to raise concerns regarding the lack of African American representation and the unequal advancement opportunities afforded to African American employees.

35. In or about September 2024, following Plaintiff's complaints regarding race-related issues, diversity concerns, and workplace conduct, Defendants subjected Plaintiff to a series of Human Resources investigations.

36. Defendants utilized Human Resources investigations as formal disciplinary proceedings that could result in corrective action, performance management, or termination.

37. During such investigations, Defendants' Human Resources representatives interviewed employees and witnesses, collected written statements, and gathered information that Defendants subsequently relied upon to justify disciplinary action against Plaintiff.

38. Plaintiff typically first learned of allegations against him only after Defendants had initiated their investigation, interviewed employees, and begun gathering information for purposes of evaluating potential disciplinary action.

39. Notably, Defendants resurrected two previously dormant workplace matters: (a) a March 2021 complaint that had been reviewed and resolved by senior leadership and remained inactive for more than three years without formal discipline; and (b) a disputed February 2023 workplace interaction involving an associate whose conduct Plaintiff had previously reported to management.

40. With respect to the February 2023 matter, Plaintiff denied the allegations against him, identified witnesses who could corroborate his account, and fully cooperated with Defendants' investigation. As a result, no corrective action was taken against Plaintiff.

41. Plaintiff expressed concern that the timing of Defendants' renewed investigation was retaliatory given its proximity to his recent complaints and protected activity. Defendants nevertheless proceeded with the investigation and informed Plaintiff that all reported matters would be reviewed regardless of the passage of time.

42. It is beneficial to note that throughout the investigation, Plaintiff denied any wrongdoing, provided a written statement at Defendants' request, identified witnesses who could corroborate his account, and fully cooperated with all investigative efforts.

43. Notwithstanding the foregoing, Defendants concluded in or about October 2024 that Plaintiff was at fault with respect to the February 2023 incident and issued written corrective action under Defendants' TAWR Policy.

44. As a consequence of the written corrective action, Plaintiff was required to complete training concerning the TAWR Policy and was placed on a performance management period that remained in effect from approximately October 2024 through May 2025.

45. Plaintiff successfully completed all requirements associated with the corrective action, including any required training, and completed the ensuing performance-management period without further disciplinary issues, policy violations, or performance concerns.

46. Following the completion of the performance management period, Plaintiff continued performing his duties as a Field Logistics Manager and remained responsible for supervising employees, addressing operational concerns, and facilitating communication between management and associates.

47. In or about October 2025, shortly after employee feedback from Defendants' Associate Voice Survey process was distributed, Plaintiff conducted a meeting with his team to review survey results, discuss workplace concerns, and solicit employee feedback regarding operational issues affecting the Transportation Department.

48. During the meeting, Plaintiff encouraged open discussion regarding workplace concerns and potential operational improvements and reiterated that employees were free to utilize Defendants' Open Door Policy and Human Resources channels if they wished to report concerns.

49. Employee feedback collected through Defendants' internal processes reflected favorable assessments of Plaintiff's leadership and management performance, undermining Defendants' later assertions that Plaintiff engaged in conduct warranting termination.

50. On or about October 15, 2025, Defendants initiated another Human Resources investigation concerning Plaintiff.

51. During the investigation, Human Resources representatives questioned Plaintiff regarding statements allegedly made during workplace meetings and advised Plaintiff that certain employees had expressed concerns.

52. Plaintiff denied the allegations, cooperated fully with the investigation, provided information in his defense, and complied with all requests made by Human Resources.

53. On or about October 28, 2025, only days before his termination, Plaintiff received a performance review from Regional Logistics Manager, Adam Gandolfo reflecting an overall successful performance rating, together with exceptional ratings in multiple performance categories.

54. At the time of the review, Plaintiff had not been informed that his employment was in jeopardy and had received no indication that his job performance was unsatisfactory.

55. On or about October 29, 2025, Plaintiff began approved time away from work.

56. Upon returning to work on November 4, 2025, Plaintiff was informed that Defendants had decided to terminate his employment.

57. Defendants represented that Plaintiff's termination was based upon alleged violations of the TAWR Policy.

58. Plaintiff denies engaging in conduct that violated the TAWR Policy and maintains that Defendants' stated reasons for disciplining and terminating him were false, and inconsistent with his successful performance history, positive employee feedback, and recent performance evaluations.

59. The temporal proximity between Plaintiff's protected activity, the investigations initiated against him, the disciplinary actions imposed, and his eventual termination supports an inference of discrimination and retaliation.

60. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered lost wages, lost employment benefits, loss of future earning capacity, emotional distress, humiliation, embarrassment, damage to his professional reputation, and other compensatory damages.

## FIRST CAUSE OF ACTION
### *RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981*
**(Against Defendants CarMax, Inc., CarMax Auto Superstores, Inc., and CarMax Enterprise Services, LLC)**

61. Plaintiff reiterates each and every allegation contained in the previous paragraphs as if set forth verbatim herein.

62. At all times relevant hereto, Plaintiff is an African American male and is a member of a protected class under 42 U.S.C. § 1981.

63. Plaintiff satisfied Defendants' stated qualifications for promotion to Senior Logistics Manager by successfully completing the Senior Management Development Program ("SMDP") on or about December 21, 2023.

64. Plaintiff also possessed substantial logistics and transportation leadership experience, consistently performed at a high level, and received successful and exceptional performance evaluations throughout his employment.

65. Despite meeting Defendants' stated promotional requirements, Plaintiff was denied promotion to Senior Logistics Manager.

66. Defendants promoted similarly situated Caucasian employees to Senior Logistics Manager positions, including individuals who had not completed the SMDP prior to promotion and individuals who lacked Plaintiff's logistics and transportation management experience.

67. Also, despite representing that there was a shortage of SMDP-qualified candidates, Defendants filled Senior Logistics Manager positions with Caucasian employees from outside the Logistics and Transportation Department rather than promoting or meaningfully considering Plaintiff, who had satisfied Defendants' stated promotional requirements and possessed extensive logistics leadership experience.

68. Plaintiff was the only African American manager within Defendants' South Carolina region known to have completed the SMDP and yet was denied promotion, while non-African American employees who completed the program or otherwise received favorable treatment were promoted.

69. Defendants applied promotional standards inconsistently and exercised promotional discretion in a manner that favored Caucasian employees over similarly situated African American employees.

70. Defendants' failure and refusal to promote Plaintiff occurred because of Plaintiff's race and deprived Plaintiff of the same contractual rights and opportunities afforded to similarly situated Caucasian employees.

71. Defendants' conduct violated Plaintiff's rights under 42 U.S.C. § 1981.

72. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered damages including lost wages, lost benefits, emotional distress, humiliation, embarrassment, damage to reputation, and other compensatory damages.

## SECOND CAUSE OF ACTION

### *RETALIATION IN VIOLATION OF 42 U.S.C. § 1981*

**(Against Defendants CarMax, Inc., CarMax Auto Superstores, Inc., and CarMax Enterprise Services, LLC)**

73. Plaintiff reiterates each and every allegation contained in the preceding paragraphs as if set forth verbatim herein.

74. Plaintiff engaged in protected activity by opposing conduct he reasonably believed violated Defendants' policies prohibiting discrimination and harassment and by reporting race-related workplace concerns through Defendants' internal reporting channels.

75. Plaintiff further engaged in protected activity by raising concerns regarding diversity, race-related workplace issues, and the lack of African American representation in leadership positions within Defendants' Transportation Department.

76. Defendants were aware of Plaintiff's protected activity.

77. Following Plaintiff's protected activity, Defendants subjected Plaintiff to adverse employment actions, including disciplinary investigations, written corrective action, heightened scrutiny, denial of promotional opportunities, and termination.

78. During those investigations, Defendants resurrected and relied upon previously dormant workplace matters, including a March 2021 complaint that had been resolved without discipline and a February 2023 incident for which no corrective action had previously been imposed.

79. Plaintiff denied the allegations against him, identified witnesses, provided written statements, and fully cooperated with Defendants' investigations.

80. Despite Plaintiff's cooperation and Defendants' prior handling of those matters, Defendants issued written corrective action against Plaintiff in October 2024 and placed him on a performance management period.

81. Plaintiff successfully completed the performance management period without further disciplinary issues.

82. Thereafter, Defendants initiated another Human Resources investigation concerning Plaintiff in October 2025.

83. Only days after Plaintiff received positive employee feedback and an overall successful performance evaluation with exceptional ratings, Defendants terminated his employment.

84. The temporal proximity between Plaintiff's protected activity, the investigations initiated against him, the disciplinary actions imposed, and his termination gives rise to a strong inference of retaliatory motive.

85. Defendants' stated reasons for disciplining and terminating Plaintiff were false, inconsistent, and pretextual and were used to conceal unlawful retaliation.

86. Plaintiff's protected activity was a motivating factor in Defendants' decisions to investigate, discipline, and ultimately terminate him.

87. Defendants' conduct violated 42 U.S.C. § 1981.

88. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has suffered damages including lost wages, lost benefits, emotional distress, humiliation, embarrassment, damage to reputation, and other compensatory damages.

### THIRD CAUSE OF ACTION

#### *BREACH OF CONTRACT*

**(Against Defendants CarMax, Inc., CarMax Auto Superstores, Inc., and CarMax Enterprise Services, LLC)**

89. Plaintiff reiterates each and every allegation contained in the preceding paragraphs as if set forth verbatim herein.

90. During Plaintiff's employment, Defendants promulgated and distributed workplace policies governing employee conduct, workplace investigations, discrimination, harassment, retaliation, corrective action, and employee treatment, including Defendants' Treating Associates With Respect ("TAWR") Policy, which represented, among other things, that Defendants were committed to maintaining a workplace free from disrespectful conduct, discrimination, retaliation, and harassment.

91. The TAWR Policy contains mandatory language and affirmative promises to employees, including representations that Defendants are committed to maintaining a workplace free from discrimination, retaliation, and harassment and that such conduct will not be tolerated.

92. The TAWR Policy contained mandatory and promissory language reasonably calculated to create contractual obligations governing the terms and conditions of Plaintiff's employment.

13

93. Plaintiff accepted and relied upon Defendants' policies and continued his employment with Defendants in reliance upon those promises.

94. Plaintiff also fulfilled his obligations under the employment relationship and complied with Defendants' workplace expectations, reporting procedures, investigative processes, and corrective-action requirements.

95. Defendants breached their contractual obligations by, among other things:

    a. Failing to provide Plaintiff a workplace free from discrimination and retaliation;

    b. Failing to enforce workplace policies consistently and uniformly;

    c. Subjecting Plaintiff to disparate treatment because of his race;

    d. Applying promotional standards inconsistently;

    e. Affording preferential treatment to similarly-situated Caucasian employees;

    f. Retaliating against Plaintiff after he reported race-related concerns and workplace misconduct;

    g. Resurrecting stale and previously resolved allegations and relying upon such allegations as a basis for disciplinary action;

    h. Applying disciplinary standards differently to Plaintiff than to similarly situated non-African American employees; and

    i. Terminating Plaintiff in a manner inconsistent with the promises and protections contained within the TAWR Policy.

96. Defendants' breaches were material and directly caused Plaintiff to suffer damages.

97. As a direct and proximate result of Defendants' breach of contract, Plaintiff has suffered lost wages, lost employment benefits, consequential damages, and other actual damages recoverable under South Carolina law.

14

**JURY TRIAL REQUESTED**

98. Plaintiff requests a jury trial.

**PRAYER FOR RELIEF**

99. **WHEREFORE**, Plaintiff prays that this Honorable Court declares that Defendants' actions complained of herein violated the rights guaranteed to Plaintiff and issue its judgment:

   a. Declaring that Defendants' acts, policies, practices, and conduct constituted unlawful race discrimination, retaliation, and breach of contract;

   b. Issuing an injunction enjoining Defendants, their agents, employees, successors, attorneys, and those acting in concert or participation with Defendants, and at their direction, from engaging in the unlawful practices set forth herein and any other employment practices shown to be in violation of 42 U.S.C. § 1981, including race discrimination and retaliation, and the common laws of the State of South Carolina;

   c. In favor of Plaintiff and against Defendants for all causes of actions herein alleged in an amount which is fair, just, and reasonable;

   d. Awarding Plaintiff all compensatory damages available under law, including damages for emotional distress, humiliation, embarrassment, mental anguish, loss of enjoyment of life, and damage to professional reputation;

   e. Awarding Plaintiff all economic damages sustained as a result of Defendants' unlawful conduct, including back pay, lost wages, lost employment benefits, lost bonuses, lost retirement benefits, prejudgment interest, front pay, loss of future earning capacity with cost-of-living adjustments, fringe benefits and retirement benefits, and all other pecuniary losses;

   f. Awarding Plaintiff punitive damages pursuant to 42 U.S.C. § 1981 in an amount sufficient to punish Defendants and deter similar conduct in the future;

15

g.  Awarding Plaintiff actual damages and all consequential damages recoverable under South Carolina law for Defendants' breach of contract;

h.  Ordering such equitable relief as the Court deems appropriate, including reinstatement to employment or, in lieu thereof, an award of front pay;

i.  Awarding Plaintiff his costs of suit, litigation expenses, reasonable attorney's fees, and all other recoverable costs as permitted by law;

j.  Awarding pre-judgment and post-judgment interest as allowed by law; and

k.  Granting such other and further relief as this Court may deem just and proper to afford complete relief to Plaintiff.

Respectfully Submitted,

s/Donald Gist

Donald Gist (13098)
***GIST LAW FIRM, P.A.***
4400 North Main Street
Columbia, South Carolina 29203
Tel. (803) 771-8007
Fax (803) 771-0063
Email: dtommygist@yahoo.com

***Attorney for Plaintiff***

June 9, 2026